RUFFIN, C. J., dissented.
The prisoner is indicted in this case for burglary, in entering the dwelling-house of James McNatt on a certain night in January, 1849. The said McNatt and his wife were the only witnesses examined for the State as to the breaking, entering, robbery, and hour of the night. McNatt stated that about 4 o'clock in the morning he was awoke by the noise of some one not far from his house, as though in distress; that he got up and removed the chair with which the front door was fastened, and opened it, and heard from the same direction some one say something about fire; that he did not understand what was meant, and he advanced some seventy-five yards towards the person who made the noise, and asked, "What do you say?" and the reply was, "Jimmy McNatt, your mother's plantation is on fire"; that he immediately returned to the house, ordered his horse, put on his clothes and started to his mother's, (464) distant two miles, and ordered his servants to follow him as fast as possible; that he left no one at home, except his wife, child, and a small servant girl; that he went as fast as he could, it being very dark when he started; that he passed near the place from whence the noise issued, but saw no one; that when he got to his mother's, he found the family asleep; that there was no fire about the plantation, and had been no alarm about any; that in conversing with his mother, after he woke her up, they concluded that he might have been mistaken, and that the fire was at one Lancaster's, a near neighbor; that he went by Lancaster's and found there had been no fire there, nor did he know of any fire happening in the neighborhood that *Page 323 
night; that he returned home a little after daylight. Stated also that his neighbors and some of their negroes were in the habit of calling him Jimmy McNatt. Stated also that he had no money about his house; that he had sent off a raft of timber some time before by his brother, who had returned, but had not accounted with him. He testified as to the tin trunk, pocketbook and note on Gillis, as described in the bill of indictment, and that they were his property; that he had them in possession and saw them immediately before the transaction, but had never seen them since. On his cross-examination he stated that it was his constant habit to fasten his front door, or cause it to be done, with a chair, by putting it against the bottom of the door with the feet fixed in a crack in the floor, and the back door by a pin and a hole in the doorpost; that he found the front door so fastened when he got up, and he believed the back door was also.
Mrs. McNatt stated that her child became sick some time before day on the morning of the occurrence; that she directed a little servant girl, who slept in the house, to get up and make a light; that she got up herself with the child, and heard a noise not far from the house, but could not understand what was said; that she opened the door to ascertain and heard (465) something about fire; that she called to her husband and told him of it; that he got up and went to the door; that he went out, came back, gave the orders he deposed to; that he and the servants went off, leaving no one with her except the little negro girl. She stated that she opened the front door by removing the chair with which it was fastened, to ascertain more about the noise she had just heard; that it was their constant habit so to fasten the front door, as it was to fasten the back door by a pin stuck in the post of the door, and she believed the back door was so fastened. And she further stated that, after her husband left, she pushed to the front door, but did not fasten it, and in the space of ten or fifteen minutes after he left, a negro opened the door, put in his head, and muttered something, and she asked, "Who is there?" He then came in and said, "Have you any money here?" and she said, "No, there is none here"; that she became very much alarmed; that the negro again spoke and said, "Haven't you got some money here? If you don't give it to me I will kill you"; that she called on her Maker, and asked, "What shall I do?" and then said to the negro, "If I give you my husband's tin trunk, that contains his pocketbook and all his papers, will you spare me?" and the negro said, "Maybe so"; that she took the tin trunk out of the chest and put it on the table, and he took it off; and that she *Page 324 
had never seen the trunk nor its contents since. She stated that, some short time after the negro left, she started towards her mother's house with her child and the servant girl, and it was then dark; that the occurrence happened on Saturday morning before day. And she also stated that the prisoner was brought before her some time after this, and she knew him, and she swore to his identity on the trial.
One White was called by the State, and he testified that, the Tuesday night before this transaction, he heard the (466) prisoner and one Barlow, a white man, in conversation; that the said Barlow said to the prisoner, "You must break open Jimmy McNatt's house and get his money," to which the prisoner made no reply; that the prisoner told Barlow to let him have two gallons of whiskey; that Barlow let him have them, and thereupon Barlow said, "If you don't do what you promised, I will kill you."
It was contended for the prisoner that there was no such breaking that would constitute burglary, supposing the doors to have been fastened, and that if the prisoner entered with the intent to steal money, he could not be convicted under the bill of indictment, as it charged a robbery of goods and chattels; and further that there was no evidence that the prisoner was the person who made the outcry.
The court charged that if the prisoner made the outcry deposed to, for the purpose of decoying McNatt out of the house, and told a falsehood about the plantation being on fire to decoy him off, with the intent to enable him to enter and steal and rob, and he entered the house at the time deposed to and committed the robbery deposed to, it would be such a fraudulent and constructive breaking as would constitute a burglary, if the door were fastened as stated by the witnesses. And the court further charged that, though the prisoner entered the house of McNatt with the intent to steal the money, yet if he committed a robbery as to the articles charged in the bill of indictment, it was well supported.
A new trial was moved for, because there was no evidence that the prisoner was the person who made the outcry, and because of misdirection on the part of the court as to what constituted a constructive burglary; and also because of misdirection as to the last point raised. A new trial was refused.
Judgment pronounced, and the defendant appealed.
We concur with his Honor that there was evidence to be left to the jury (and we think strong evidence) that the prisoner was the person who made the outcry and gave the false alarm of "fire." We also concur with him that there was evidence to be left to the jury of the felonious intent charged in that indictment.
But as to that part of the charge which refers to the burglarious breaking, there is a difference of opinion between the members of this Court; and I proceed to give my own opinion.
The prisoner's counsel moved the court to charge "that there was no such breaking as would constitute a burglary."
The court charged "that if the prisoner made the outcry for the purpose of decoying Mr. McNatt out of the house, and told a falsehood about the plantation being on fire to decoy him off, with the intent to enable him to enter, to steal and rob, and he entered the house at the time deposed to, and committed the robbery, it would be such a fraudulent and constructive breaking as would constitute a burglary."
I am not willing to extend the doctrine of constructive breaking further than the decisions have already carried it. In my opinion, the charge of his Honor goes beyond any of the cases cited in the argument, and any that I have met with.
Constructive breaking, as distinguished from actual forcible breaking, may be classed under the following heads:
1. When entrance is obtained by threats, as if the felon threatens to set fire to the house unless the door is opened.
2. When, in consequence of violence commenced or (468) threatened in order to obtain entrance, the owner, with a view more effectually to repel it, opens the door and sallies out, and the felon enters.
3. When entrance is obtained by procuring the servants or some inmate to remove the fastening.
4. When some process of law is fraudulently resorted to for the purpose of obtaining an entrance.
5. When some trick is resorted to to induce the owner to remove the fastening and open the door, and the felon enters; as, if one knock at the door, under pretense of business, or counterfeits the voice of a friend, and, the door being opened, enters.
In all these cases, although there is no actual breaking, there is a breaking in law or by construction; "for the law will not endure to have its justice defrauded by such evasions." In all other cases, when no fraud or conspiracy is made use of or violence commenced or threatened in orderto obtain an entrance, there must be an actual breach of some part of the house. 2 East, 484, 489. *Page 326 
A sixth class is added by statute 12 Anne, when one, being in a house, conceals himself, and at night rifles the house and breaks out.
Two remarks may be made upon all the adjudged cases of constructive breaking.
There is no case when the entry was not made immediately after the fastening was removed, or so soon thereafter as not to allow a reasonable time for shutting the door and replacing the fastening.
There is no case when the artifice resorted to was not apparently andexpressly for the purpose of getting the fastening removed, whereby to gain admittance without breaking it, and so "defraud the law of its justice by an evasion."
In this case the entry was not immediate. Fifteen minutes expired, during which there was ample opportunity to (469) replace the fastening. It was gross neglect not to fasten the door and put the dwelling under the protection of the law, so far as the fastening was concerned. This highly penal law was not intended for the protection of those who neglect to fasten.
Upon this ground I think the charge was wrong. If a felon actually breaks, as by boring through and removing the fastening, on one night, and enters the next night, it is burglary; but if the owner finds it out and leaves it so, even although it be for the purpose of apprehending the felon, it would not be burglary, for the fastening was not relied upon.
I also think the charge was wrong upon the other ground. If one, intending to go at night and rob a house, tell the owner during the preceding day that some friend at a distance, say twenty miles, wishes to see him on urgent business, and, by this false word, induces him to leave home, and goes at night, finds the door unfastened, enters and steals, it is not burglary; because it was the neglect of the owner not to fasten his house, and because it could not be supposed to have been the purpose of the felon to procure the door to be left unfastened as well as to get the owner out of the way.
In this case the apparent purpose was to induce McNatt to leave home. It may be that the purpose also was to have the door unfastened, at the time it was the design of the prisoner to enter, but this latter was not the apparent purpose and was a remote and contingent circumstance, and, in all probability, was not calculated upon; for it was reasonable to suppose, after McNatt left home at night, his wife would in common prudence secure the door. At all events, whether this latter purpose was entertained by the prisoner, as well as the apparent purpose of inducing McNatt to leave home, was a matter of doubt. *Page 327 
As the interval between the time of the artifice and the entry increases, the probability that this double purpose existed diminishes. Here the interval was fifteen minutes, and it certainly was necessary for the jury to find that there was (470) this double purpose, to justify a conviction.
I admit the omission to charge in a particular way, or to draw the attention of the jury to a particular distinction, is not error, unless it is suggested and the judge is requested so to charge. But it is error to lay down a proposition which is not true and is calculated to mislead by inducing the jury to return a verdict without passing upon a material fact.
The charge is, if the outcry was made to decoy McNatt out of the house and the falsehood was told to decoy him off, with the intent to enable the prisoner to enter, it was a constructive breaking. What is the meaning of this? How was the prisoner to be enabled to enter? Obviously, by getting McNatt out of the house, and decoying him off, so that an entry could be made in his absence and without opposition by him. This is the only fact to which the jury were called upon to respond. The proposition does not involve the further fact, that the intention was also to enable the prisoner to enter, by having the door left unfastened, at the time he designed to make the entry; and, therefore, the proposition is not true in point of law. In other words, the jury were only to find the single intent of being able to enter by getting McNatt off, and not the double intent of being able to enter by getting him off and also having the door left unfastened, which latter fact is material to a conviction; admitting, for the sake of argument, that the entry need not be made immediately, or so soon after the door is opened as not to allow time to replace the fastening, as insisted upon in the ground first taken.
I think the judgment should be reversed, and a venire de novo awarded.